UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOSIE L. HELEM,                           )
                                          )
            Plaintiff,                    )
                                          )
      vs.                                 )        Case No. 4:09CV01827 AGF
                                          )
MICHAEL J. ASTRUE,                        )
Commissioner of Social Security           )
Administration,                           )
                                          )
            Defendant.                    )

**<u>MEMORANDUM AND ORDER</u>**

This matter is before the Court for judicial review of the final decision of the

Commissioner of Social Security finding that Plaintiff Josie L. Helem was not disabled,

and thus, not entitled to disability insurance benefits under Title II of the Social Security

Act, 42 U.S.C. §§ 401-434, or supplemental security income ("SSI") under Title XVI of

the Social Security Act, 42 U.S.C. §§ 1381-1383f. For the reasons set forth below, the

decision of the Commissioner shall be affirmed.

Plaintiff, who was born on July 5, 1961, filed for disability insurance benefits and

SSI on September 12, 2006, alleging a disability onset date of June 23, 2006, at age 44,

due to back pain and depression. After Plaintiff's application was denied at the initial

administrative level, she requested a hearing before an Administrative Law Judge ("ALJ")

and such a hearing was held on January 31, 2009, at which Plaintiff and a Vocational

Expert ("VE") testified.

By decision dated February 20, 2008, the ALJ found that Plaintiff had the residual function capacity ("RFC") to perform the physical exertional and nonexertional requirements of work except for prolonged or frequent walking; lifting or carrying objects weighing more than 10 pounds frequently, or more than 20 pounds occasionally; more than occasional climbing of ropes, ladders or scaffolds, stooping, or crouching; doing more than simple repetitive tasks; or having more than occasional interaction with co-workers, supervisors or the general public. Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on September 11, 2009. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record as a whole. Specifically, Plaintiff argues that the ALJ erred in evaluating Plaintiff's RFC with respect to Plaintiff's mental ability. She also argues that the Appeals Council erred in holding that the March 30, 2009, Medical Assessment completed by Bernard Feinberg, M.D., Plaintiff's treating psychiatrist, which was submitted to the Appeals Council after Plaintiff's hearing with the ALJ, did not affect the ALJ's decision that Plaintiff was not disabled beginning on or before February 20, 2008.

## BACKGROUND

### Work History

Plaintiff reported that she worked as a truck driver from September 1988 through June 2006, earning $0.34 per mile. This job required Plaintiff to walk and stand three hours per day; sit 18 hours per day; climb five hours per day; stoop, kneel, or crouch one

hour per day; handle small objects 30 minutes per day; and handle big objects after certain deliveries. She frequently lifted less than 10 pounds, but never lifted more than 50 pounds. (Tr. 148-49.) Between 1979 and 2006, Plaintiff's earnings fluctuated between approximately $8,000 and $32,000 per year, with her highest earnings in 2005, but earnings of less than $9,000 in 2002, and no earnings in 2003. (Tr. 122.)

**Medical Record**

Plaintiff saw Angela M. Ryerson, M.D., on December 9, 2003, complaining of chronic lower back pain that had recently become worse, and reported that her pain level was at a nine on a 10-point scale. Plaintiff also screened positive for depression. (Tr. 201, 254-55, 318-20.)

On December 30, 2003, Plaintiff visited a psychologist for a medical psychology consultation. Plaintiff reported a depressed mood, loss of interest or pleasure in activities, weight change, sleep disturbance, agitation, fatigue, feelings of worthlessness or guilt, and problems with concentration. She was diagnosed with depression, and reported that she was interested in both medication and psychotherapy. (Tr. 257-58.)

On May 3, 2004, Plaintiff visited a nurse practitioner, complaining of back pain, and was prescribed Robaxin (a muscle relaxant) and naproxen. (Tr. 314-16.) On May 27, 2004, Plaintiff visited Dr. Ryerson, complaining of severe lower back pain, that had persisted for more than one year. Plaintiff assessed her pain as a 10 on a 10-point scale, but the examining nurse noted that Plaintiff's self-report of pain did not correspond with her non-verbal pain behaviors. (Tr. 311-14.)

On July 1, 2004, Plaintiff visited Dr. Ryerson, complaining of lower back pain. Plaintiff received physical therapy, which alleviated her pain. (Tr. 250-52, 308-10, 454-57.) Plaintiff complained of lower back pain again on July 15, 2004, and inquired about an injection to help with the pain, and about exercise programs. (Tr. 307-08, 453-54.) Plaintiff missed a physical therapy appointment on July 26, 2004, and an aquatic therapy appointment on August 23, 2004. (Tr. 247, 306-07, 399-400, 452-53.)

On March 14, 2005, Plaintiff requested to see a mental health professional because she was over-stressed and having nightmares constantly. Plaintiff was seen by Jane C. Tomory, a social worker, for her complaints of depression and nightmares. Plaintiff reported feeling sad and depressed, daily crying spells, irritability, decreased concentration and short term memory, and having negative thoughts. She also stated that she smoked "a marijuana joint or two on the weekends to help with sleep." Ms. Tomory noted that Plaintiff reported what sounded like panic attacks and a history of childhood abuse. (Tr. 297-301, 397-98.)

Plaintiff returned to see Ms. Tomory on March 25, 2005, reporting several past traumatic incidents involving the deaths of relatives, as well as childhood abuse. She also asked for a prescription for depression. (Tr. 258, 296-97.) Plaintiff visited Ms. Tomory again on April 7, 2005, and discussed further past traumatic events. (Tr. 258, 295-96.)

Plaintiff saw Dr. Ryerson on April 7, 2005, complaining of back pain. Dr. Ryerson referred Plaintiff to orthopaedics and prescribed Celexa for Plaintiff's depression. (Tr. 198-99, 292-95, 388-92, 438-41.) The next day, Plaintiff visited a

prosthetist, who issued Plaintiff an "Abdominal binder/Back support." (Tr. 235-36, 291-92, 394-97.)

On October 13, 2005, Plaintiff visited the emergency room, reporting that she had been in an accident three days before. She reported that in the accident, she had been hit by another eighteen-wheeler and hit the left side of her body against the door "real hard," and "must have passed out." Plaintiff was prescribed Flexeril and Tylenol. (Tr. 284-88, 513-16.)

Plaintiff visited Dr. Ryerson on June 15, 2006, complaining of lower back pain. (Tr. 230-32, 281-84, 382-87.) On July 10, 2006, Plaintiff visited a chiropractor, reporting pain in the L2-L4 area of her back, which did not spread, and was worse when she stood or laid down, but was relieved when she sat. (Tr. 277-81.) The day after her adjustment, Plaintiff reported that she felt no pain. (Tr. 421-22.)

Plaintiff visited Dr. Ryerson on August 15, 2006, reporting that she needed disability, had a hard time getting to the chiropractor, and needed help for her depression. Dr. Ryerson submitted a request to the Veteran's Administration for a psychiatric consultation for Plaintiff's depression. (Tr. 271-72, 379-80.) On August 16, 2006, Plaintiff saw Kathryn K. Freese, N.P., complaining of "a lot of pain." Plaintiff stated that she needed disability, and reported that she had quit her job because of her back pain. (Tr. 414-15.)

On October 18, 2006, Kyle DeVore, Ph.D., a state agency psychologist and medical consultant, completed a Psychiatric Review Technique based upon Plaintiff's medical records, covering the time period from June 23, 2006, onward. Dr. DeVore

indicated that Plaintiff suffered from an affective disorder, identified as recurrent major depressive disorder, as well as from an anxiety-related disorder,[1] identified as post-traumatic stress disorder ("PTSD").  Dr. DeVore also noted that Plaintiff suffered from current alcohol and cannabis abuse.  Dr. DeVore stated that Plaintiff had mild restrictions with activities of daily living, and that she had moderate difficulties in maintaining social functioning, and in maintaining concentration, persistence, or pace.  He noted that there was insufficient evidence to determine whether Plaintiff's conditions resulted in repeated extended episodes of decompensation.  In the narrative section, he noted that Plaintiff complained of extreme pain, isolation and depression, had a traumatic past, used alcohol and marijuana, and had "issues with ongoing DAA" which were "not material, but [were] contributing to [Plaintiff's] functional limitations."  He also indicated that Plaintiff's "[a]lleged functional limitations are partially credible at most."  He concluded that Plaintiff was capable of simple repetitive work with social restrictions. (Tr. 326-36.)

Dr. DeVore also stated that a Mental RFC Assessment was needed, which he completed that same day.  He indicated that Plaintiff was not significantly limited in her ability to remember locations and work-like procedures; to understand and remember very short and simple instructions; to carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to make

[1] The Court notes that Dr. DeVore checked the box indicating that Plaintiff suffered from "mental retardation;" however, this was most likely a mistake because that portion of the assessment did not indicate any specific findings, and the "mental retardation" box was directly next to the "anxiety-related disorders" box.  While there are no other mental retardation findings in the report, there are several references to anxiety-related disorders.

simple work-related decisions; to ask simple questions or request assistance; to maintain socially appropriate behavior; to adhere to basic standards of neatness and cleanliness; to be aware of normal hazards and take appropriate precautions; and to travel in unfamiliar places or use public transportation.

However, Dr. DeVore indicated that Plaintiff was moderately limited in her ability to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and work week without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in work settings, and to set realistic goals or make plans independently of others. In the narrative section of the assessment, Dr. DeVore noted that Plaintiff must avoid work involving intense or extensive interpersonal interaction, handling complaints or dissatisfied customers, close proximity to co-workers, close proximity to available controlled substances, or public contact. He also noted that Plaintiff could understand, remember, carry out, and persist at simple tasks, make simple work-related adjustments, relate adequately to co-workers and supervisors, and adjust adequately to ordinary changes in work routine or setting. (Tr. 337-39.)

On October 19, 2006, A. Tayob, a medical consultant, completed a Physical RFC Assessment, based upon Plaintiff's medical records. He indicated that Plaintiff could occasionally lift and/or carry up to 50 pounds and frequently lift and/or carry up to 25 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; push and/or pull without any additional limitations; frequently climb ramps and stairs, stoop, and crouch; and occasionally climb ladders, ropes and scaffolds, kneel and crawl. He indicated that Plaintiff was unlimited in her ability to manipulate, with the exception that she had difficulty reaching overhead on the left, and had no visual, communicative, or environmental limitations. Lastly, he noted that "her weight is related to much of her back pain and generalized aches/pains," it "appear[ed] that her subjective complaints are a bit out of proportion to the objective findings," and "[h]er statement and allegations are partially credible." (Tr. 340-45.)

On October 23, 2006, Plaintiff left a voicemail for a nurse case manager, stating that she was in extreme pain, and needed to get disability because she was depressed and had no income. Plaintiff's Tramadol and naproxyn prescriptions were refilled, and she was prescribed cyclobenzaprine to help her sleep. (Tr. 574-76.)

On November 1, 2006, Plaintiff visited Patrick A. Oruwari , M.D., a psychiatrist, for an initial consultation, reporting depression due to childhood abuse and her recent accident. Plaintiff reported financial strain due to her inability to work, as well as not wanting to get up, poor motivation and sleep, taking a long time to accomplish tasks due to her pain, nightmares based on past trauma, poor concentration, crying spells, helpless

feelings, low energy, variable appetite, and recent weight gain. She also reported drinking alcohol occasionally, but may consume up to "a fifth" at a time, and that she had smoked marijuana all of her life. Dr. Oruwari stated that Plaintiff's depression was due to her perception that she was basically helpless to improve her condition. He noted that her sleep was impaired; her appetite was increased; she had a depressed mood and affect; her appearance was abnormal (obese); her concentration was poor. He further noted that Plaintiffs thought process was normal; she was alert and oriented; and she had good immediate recall, memory, insight, and judgment. Dr. Oruwari diagnosed Plaintiff with a major depressive disorder, chronic physical and psychological pain disorder, cannabis dependence, rule-out alcohol abuse, and a GAF[2] of 50. (Tr. 568-74.)

Plaintiff spoke with Ms. Tomory on November 2, 2006. Plaintiff reported that she had been unable to work since June and was frustrated because she didn't qualify for any financial resources other than food stamps. She also reported that she was frustrated with her inability to get approved for social security benefits. (Tr. 568.)

On November 30, 2006, Plaintiff underwent a CT without contrast of her lumbar spine and cervical spine, which revealed mild diffuse posterior bulging at the L4-L5 disc

---

[2] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. GAF scores of 21-30 reflect behavior that is "considerably influenced" by delusions, hallucinations, serious impairment in communication or judgment, or an inability to function in almost all areas; scores of 31-40 indicate "some" impairment in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32-4.

in Plaintiff's lumbar spine. (Tr. 608-11.) Plaintiff also visited a neurologist, who diagnosed Plaintiff with pain in her lower and middle back, and noted that Plaintiff probably had ligament and muscular strains in her back. He referred her to the physical therapy department for a TENS unit. (Tr. 562-55.) On December 12, 2006, Plaintiff saw a physical therapist and was issued a TENS unit. (Tr. 601-03.)

On February 20, 2007, Plaintiff spoke with a nurse, stating that she wanted a back brace, had run out of medicine from her psychologist, and requested to speak with Ms. Tomory. (Tr. 549-50.) On February 22, 2007, Plaintiff spoke with Ms. Tomory, stating that she was frustrated that the cause of her pain had not been found and the pain interfered with her sleep. Ms. Tomory recommended that Plaintiff get an MRI and helped her schedule one. (Tr. 548-49.)

On February 26, 2007, Plaintiff was seen by a neurologist, complaining that her lower back pain had become worse, and she was unable to relieve the pain using medication or a TENS unit. The neurologist prescribed Topomax and a low dose of topiramate for Plaintiff's neuralgic pain. (Tr. 539-44.)

On March 9, 2007, Plaintiff visited a prosthetist who measured, fitted, and instructed Plaintiff in the safe use of a lumbar corset back brace. (Tr. 538-39.)

On March 13, 2007, Plaintiff returned to Dr. Oruwari. Plaintiff indicated that she was "alright," but Dr. Oruwari noted that she was depressed and had low motivation. He diagnosed Plaintiff with a GAF of 50. (Tr. 535-38.) Plaintiff also saw a social worker, who noted that Plaintiff's unemployment and pain caused her stress, and that Plaintiff displayed suicidal ideation or behavior, or both. (Tr. 533-35.)

Plaintiff returned to N.P. Freese on March 21, 2007, complaining of continuing back pain. She stated that her pain medications were unhelpful and mostly just made her feel "high," and noted that she was not sleeping well. N.P. Freese gave Plaintiff lidocaine patches to help reduce her back pain and improve her sleep, and referred her for orthopaedic and psychiatric evaluations. (Tr. 529-33, 592-93.)

On March 22, 2007, Plaintiff visited Ms. Tomory, who noted that Plaintiff had been denied social security benefits, and indicated that she was willing to speak with Plaintiff's lawyer regarding Plaintiff's application for disability benefits. Plaintiff also spoke with another social worker, reporting that she was in a great deal of pain and the medications she was on limited her daily function. The social worker discussed stress management with Plaintiff and noted that Plaintiff agreed that she needed to do more activities during the day, but stated that she was unable to get out of bed. (Tr. 527-29.)

Plaintiff returned for another visit with the social worker on March 29, 2007. Plaintiff reported that she was currently drug free and that her primary concerns were her lack of focus in her personal life and her mental health process. (Tr. 525-26.) Plaintiff returned to the social worker on April 5, 2007, for treatment of her depression. (Tr. 524-25.)

On April 23, 2007, Plaintiff spoke with Steven R. Brenner, M.D., on the telephone, complaining of chronic lower back pain. Dr. Brenner noted that Plaintiff's MRI indicated that she had facet joint disease or facet joint hypertrophy, and he recommended joint injections and physical therapy consultations for Plaintiff's back. The following day, N.P. Freese noted that she had previously sent Plaintiff for physical

therapy, but that Plaintiff had missed that appointment. (Tr. 521-23.) On April 30, 2007, Plaintiff received an injection of 1.25cc of Depomedrol (an anti-inflamatory). (Tr. 519-21.)

Plaintiff visited the social worker again on May 2, 2007. The social worker noted that Plaintiff displayed suicidal ideation or behavior, and discussed depression education with Plaintiff. Plaintiff indicated that she was feeling better and wanted some information about depression that she could read on her own. (Tr. 554-56.)

Plaintiff canceled an appointment with Dr. Oruwari scheduled for May 14, 2007. (Tr. 518-19.)

On June 7, 2007, Plaintiff visited a physical therapist and reported that her back was feeling better because she had received four cortisone shots in May. (Tr. 481-84.)

Plaintiff returned to the social worker on June 25, 2007. The social worker noted that they processed Plaintiff's feeling of stress due to not working and having no social outlets. (Tr. 477-79.) Later that day, Plaintiff visited Dr. Oruwari in order to get an "excuse for jury duty." Plaintiff reported that she suffered from depression and had "a lot of social issues," but also noted that her mother had noticed an improvement in her, and she was attending to her activities of daily living better than before. Dr. Oruwari noted that she was depressed, she tended to be humorous, and she had an abnormal mood and affect. He diagnosed her with a GAF of 53, and noted that she was aggravated being amongst people, and therefore could not possibly be a juror. He also increased the dosage of her anti-depressant, paroxetine. (Tr. 477-77.)

Plaintiff visited N.P. Freese on August 30, 2007, complaining of lower back pain

and depression, but stating that she did not have any suicidal thoughts. N.P. Freese noted that Plaintiff's self-report of pain did not correspond with her non-pain behaviors, and that Plaintiff's current treatment had been effective. She also noted that Plaintiff's back pain was somewhat better, and she was still depressed. (Tr. 496-99.)

On October 10, 2007, Plaintiff called Dr. Brenner complaining of excruciating lower back pain and stating that she needed a "diagnosis of the back pain for her lawyer." Dr. Brenner noted that the MRI of Plaintiff's lumbosacral spine was "normal," but that she had some mild bulging discs. He also noted that he would see if he could repeat the injections in her back. (Tr. 626-29.)

Plaintiff visited the emergency room on October 14, 2007, complaining of chronic lower back pain that had increased in the last week. Plaintiff was diagnosed with exacerbated lower back pain, was prescribed Robaxin for muscle spasms, and was instructed to apply alternating heat and cold to the affected area. (Tr. 623-26.)

On October 19, 2007, Plaintiff visited Patrice L. Pye, Ph.D., a psychologist, for a psychological evaluation. Dr. Pye noted that they discussed the traumatic events in Plaintiff's past, and Plaintiff reported poor sleep, decreased energy and concentration, increased appetite and guilt, and changes in her libido. Dr. Pye diagnosed Plaintiff likely suffered with PTSD and stated that Plaintiff had been coping, in part, by numbing herself. (Tr. 617-18.)

On January 12, 2008, Plaintiff was seen by Dr. James T. Hurley, a licensed psychologist, for a consultative evaluation at the request of her attorney. Dr. Hurley reviewed Plaintiff's education, work history, medical history, and daily living activities.

He administered the Beck Depression Inventory and Plaintiff obtained a score of 52, which Dr. Hurley qualified as "severe." He noted that Plaintiff's affect was somewhat euphoric, her mood depressed and tearful, and her speech was within normal limits. Plaintiff reported problems with memory and sustained concentration. Dr. Hurley diagnosed Plaintiff with severe, recurrent, major depression, and a GAF of 50. Finally, Dr. Hurley stated that it was his professional opinion that Plaintiff would not be able to work in the competitive labor market based solely on her psychiatric symptoms, much less her physical problems. He stated that she needed appropriate psychotherapy, her prognosis was very guarded, and her stress from her unstable medical condition continued to contribute to her depression. (Tr. 632-36.)

### Additional Medical Records Submitted to the Appeals Council

Plaintiff submitted additional medical records to the Appeals Council, covering the time period of January 2008 through July 2009, which documented her ongoing treatment for depression and back pain. (Tr. 637-782.) Plaintiff missed an appointment with Dr. Feinberg on March 19, 2008, and began visiting him periodically over the next year for psychiatric treatment. (Tr. 643-44, 651, 674-77, 748, 751.)

On March 30, 2009, Dr. Feinberg completed a medical assessment of Plaintiff's mental ability to do work-related activities. Assessing Plaintiff's ability to make occupational adjustments, Dr. Feinberg stated that Plaintiff had a fair ability to follow work rules and maintain attention for a duration, and a poor or no ability to relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, or function independently. Dr. Feinberg recounted a March 2009 incident

wherein Plaintiff threatened her mother's boyfriend with a gun, and stated that Plaintiff had extremely little tolerance for frustration, regarded others with suspicion, and generally related in an accusatory manner. Assessing Plaintiff's ability to make performance adjustments, Dr. Feinberg stated that she had a fair ability to understand, remember, and carry out simple or detailed job instructions, and a poor or no ability to understand, remember, and carry out complex job instructions. He noted that Plaintiff was very impatient, interrupted others in conversation, and walked out of the room when frustrated. Assessing Plaintiff's ability to make personal social adjustments, Dr. Feinberg stated that Plaintiff had a fair ability to maintain her personal appearance, and a poor or no ability to behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability. He further noted that Plaintiff had been living in her mother's basement for at least two years, cried often, and spent her time writing autobiographical sketches about prior traumatic experiences. Finally, Dr. Feinberg stated that Plaintiff complained of back pain, and was unable to manage benefits in her own best interest. (Tr. 775-76.)

**Evidentiary Hearing of January 31, 2009 (Tr. 6-48.)**

Plaintiff, who was represented by counsel, testified that she was forty-seven years old and lived with her mother. She stated that she lived in the basement of the house, which required her to go up and down stairs, and that, due to back problems, she had stopped driving approximately one and a half years ago. Plaintiff testified that she currently was not working, had no source of income, but was receiving $167 per month in food stamps, as well as some support from her mother. She also stated that although she

did not have medical insurance, she was receiving care through the Veteran's Administration.

Plaintiff testified that she had been in the Army for a total of eight years as a truck driver, and had been honorably discharged. She also stated that she had a high school diploma, could read and write, and had a commercial driver's license, but had no additional education or training. She had worked as a truck driver for approximately the last twenty years.

Plaintiff indicated that she had suffered several injuries during her previous work as a truck driver. She stated that the first injury occurred as part of a trucking accident on the day before Thanksgiving in 2004. She testified that in a second accident, she was hit in the mouth by a trailer door latch, knocking out one of her teeth, and in a third accident on October 11, 2005, she was hit by another truck. She complained to her company about the injuries, but did not file a workers' compensation claim, nor had her company filed anything regarding her injuries. Plaintiff also testified that she had applied for unemployment benefits, but did not qualify because she had quit her job due to her pain.

Plaintiff testified that on June 23, 2006, the pain became so bad, and she had a panic attack, so she was no longer able to work as a truck driver. She subsequently had "a couple of interviews" for jobs related to trucking, but was unsuccessful because of her lack of transportation, her anxiety, and her pain. Plaintiff did not feel she could perform the job of a truck driver anymore, and stated that she might be able to work as a dispatcher if she did not have to sit or stand for a long period of time.

Plaintiff testified that she normally woke up at between 2:00 a.m. and 3:00 a.m., and went to sleep at 4:00 p.m., because of her medication. She stated that she folded the laundry and helped with cleaning and other chores at home, although it took her "a long time." She could not cook because her mother did not allow her in the kitchen and did not allow her to use appliances. Her mother also did the grocery shopping for her. She did not do many activities during the day and had little social contact with others; however, she sometimes took care of her mother's grandchildren, which she enjoyed, and also did some gardening. She indicated that she was physically able to take a shower, smoked about half a pack of cigarettes per day, did not have any drinking problems, and had used marijuana in the past, but no longer did so.

Plaintiff stated that she was taking Trazodone, which helped her sleep; Psychobenzaprine, a muscle relaxant; hydrochlorothiazide, for her high blood pressure; and Ibuprofen and Tylenol for pain. She also stated that she had quit taking Topiramate the week before because it made her lose her memory, and that the Trazodone made her very dizzy.

Plaintiff testified that her main physical problems were the pain in her back and her left shoulder. She stated that if she were not taking her medications, the pain in her back would be "excruciating," a 10 on a 10-point scale. Her medications helped treat the pain, but put her to sleep almost immediately. She also stated that she used a back brace at times. Plaintiff stated that even at the hearing she was experiencing a great deal of pain from having to sit.

Plaintiff testified that she could sit for 15 minutes at most, could stand for 20 to 30 minutes at most, and could walk for a block and a half, or two. She estimated that she could lift 10 to 15 pounds. She also stated that, even though it was painful, she could bend, and she could kneel, stoop and navigate stairs.

Plaintiff also testified that she suffered from depression and cried every morning. She had two panic attacks in the last three months, which were brought on by her becoming upset. However, she indicated that she did not have any thoughts of suicide. She testified that she was being treated by Dr. Oruwari for her depression, and that he had prescribed her Paxil. She also testified that because she was "heavily medicated," she was not sure whether she had any problems with hallucinations. She also noted that she had problems concentrating.

Plaintiff testified that she had cut all of her hair off recently because she was frustrated that she could not afford to have her hair done. She also stated that she did not take showers four or five days of the week. She reiterated how depressed she felt, and noted that she had increased the frequency of her appointments with Dr. Oruwari from every three months to every two weeks, and spoke with a social worker daily.

Plaintiff testified that during the summer she would go to the pool with the kids twice a week and stand in the pool while they swam. She testified that her shoulder and back pain had gotten worse after she had received some shots. She also testified that the medical records indicating that she drank alcohol and used marijuana were mistaken because, although she had done so in the past, she no longer used either.

The VE reviewed Plaintiff's work history, and through questions posed to

Plaintiff, clarified that by "truck driver" Plaintiff meant she drove tractor-trailers, also known as eighteen-wheelers. The VE then stated that Plaintiff had been a tractor-trailer truck driver, which is classified as medium and semi-skilled work. He also noted that because Plaintiff had unloaded trucks, her past work had also been as a laborer, which is typically classified as medium and unskilled work, but as performed by Plaintiff, may have been heavy or very heavy.

The ALJ then asked the VE to assume a hypothetical individual with Plaintiff's age, education, and past work experience; who had no transferrable skills; and who was capable of performing light exertional work; could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; could sit and stand six out of eight hours, but must have a sit/stand option; could walk for two out of eight hours; could occasionally stoop, crouch, use a ladder, rope, or scaffold; was limited to simple repetitive tasks and instructions; and could only occasionally interact with supervisors, co-workers, and the public. The VE stated that such an individual could not perform Plaintiff's past work, but testified that such an individual could perform other jobs such as mail clerk or sorter, office helper, or assembly worker, all of which were available in significant numbers in both the local and national economy. The VE stated that these jobs were representative and not an exhaustive list of jobs such an individual could perform.

The VE then testified that an individual with the same criteria as above, but who would also be limited to only occasionally reaching in all directions, including overhead, would not be able to perform any of the above-listed jobs. However, such an individual would be able to perform jobs such as bakery worker, surveillance system monitor, or call

out operator, all of which were available in significant numbers in both the local and national economy. The VE then confirmed that his testimony was consistent with The Dictionary of Occupational Titles and The Selected Characteristics of Occupations.

The VE also testified that a hypothetical individual that suffered from depression such that the individual could not get up, get dressed, or bathe four days per week, would neither be able to perform Plaintiff's past work, nor be able to perform any other work.

**ALJ Decision of February 20, 2008  (Tr. 54-62.)**

The ALJ found that Plaintiff met the insured status requirement for disability as of June 23, 2006, the alleged onset of disability, and continued to meet them through February 20, 2008, the date of the decision. The ALJ next determined that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date. The medical evidence established that Plaintiff was obese, had mild degenerative disc disease of the lumbosacral spine and cervical spine, hypertension controlled by medication, and a recurrent major depressive disorder. However, the ALJ determined that none of these impairments individually, nor any combination thereof, met or equaled in severity the requirements of any impairment listed in the Commissioner's regulations. He also determined that Plaintiff's allegations of impairments, either singly or in combination, producing symptoms and limitations of sufficient severity to prevent the performance of any sustained work activity, were not credible.

The ALJ determined that Plaintiff had the RFC to perform the physical exertional and nonexertional requirements of work, except for prolonged or frequent walking; lifting or carrying objects weighing more than 10 pounds frequently, or more than 20 pounds

occasionally; more than occasional climbing of ropes, ladders or scaffolds, stooping, or crouching; doing more than simple repetitive tasks; or having more than occasional interaction with co-workers, supervisors or the general public.

In support of his RFC assessment, the ALJ summarized Plaintiff's education, work and medical history, and concluded that the evidence in the record was inconsistent with Plaintiff's allegation of disability. He noted Plaintiff's alleged symptoms due to her depression were not supported by documented evidence, and noted that she did not exhibit any obvious signs of depression, anxiety, memory loss, or other mental disturbance, at the hearing. The ALJ also stated that to the extent that the Plaintiff's daily activities were restricted, they were restricted "much more so by her choice than by any apparent medical proscription."

The ALJ found that there was no evidence in the record of Plaintiff having a mental impairment or combination of mental impairments that met or equaled the criteria of any impairments listed in Sections 12.02-12.10 of Appendix 1 of the Commissioner's regulations. He found that Plaintiff had only mild restrictions of mental activities of daily living, and no more than moderation limitations in maintaining of social functioning. He also found that she had no marked deficiencies of concentration, persistence or pace, resulting in failure to complete tasks in a timely manner in work settings or elsewhere so long as she restricted herself to simple, repetitive tasks. While the ALJ noted that Plaintiff had some moderate inability to perform these functions independently, appropriately, and effectively, on a sustained basis, he noted that Plaintiff did not have any extreme inability to do so. He also noted that there were no recorded episodes of

decompensation resulting in a total of extreme loss of Plaintiff's adaptive functioning. Therefore, the ALJ found that Plaintiff had no worse than a moderate limitation in her ability to do basis work activities.

The ALJ found that, based on the VE's testimony, Plaintiff's limitations did prevent her from performing her past work. However, there were nonetheless jobs existing in significant numbers in the national economy that someone of Plaintiff's age, education, work experience and RFC could perform. The ALJ concluded that Plaintiff did not have any credible, medically-established mental or mood disorder that would prevent her from doing ordinary work, and specifically noted that she could perform any of a total of about 2,500 jobs in St. Louis and about 98,000 jobs nationwide, as a bakery worker, surveillance system monitor, or call out operator. Thus, the ALJ found that Plaintiff was not under a disability, as defined in the Social Security Act, at any time through the date of his decision.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court "must affirm the Commissioner's decision so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court

must "'also take into account whatever in the record fairly detracts from that decision.'"

Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)).

"Reversal is not warranted, however, 'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

> It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo. If, after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits.

Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (citations omitted).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A); Barnhart v. Walton, 535 U.S. 212, 217-22 (2002). The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). A special technique is used to determine the severity of mental disorders. This technique calls for rating the claimant's degree of limitations in

four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Id. § 404.1520a(c)(3).

If the claimant does not have a severe impairment or combination of impairments that meets the duration requirement, the claim is denied. If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in the Commissioner's regulation, 20 C.F.R. Pt. 404, Subpt. P, App. 1. If so, the claimant is conclusively presumed to be disabled. Otherwise, the Commissioner asks at step four whether the claimant has the residual functional capacity to perform his past relevant work, if any. If the claimant can return to past relevant work, the claimant is not disabled. Otherwise, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant has the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Commissioner's Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment. Where a claimant cannot perform the full range of work in a particular category due to nonexertional impairments, such as depression, the Commissioner cannot carry the step-five burden by relying on the Guidelines, but must

consider testimony of a vocational expert as to the availability of jobs that a person with the claimant's profile could perform.  Baker v. Barnhart, 457 F.3d 882, 888 n.2, 894-95 (8th Cir. 2006).

**ALJ's RFC Determination**

Plaintiff argues that the ALJ did not properly analyze Plaintiff's mental limitations, and erred in finding that Plaintiff had the RFC to perform work that did not require more than doing simple repetitive tasks or having more than occasional interaction with coworkers, supervisors, or the general public, because these findings were not supported by any medical evidence in the record.

A disability claimant's RFC is the most she can still do despite her limitations.  20 C.F.R. § 404.1545(a)(1).  In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  Id. at 1147.  The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

"Some medical evidence is necessary to support the ALJ's determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace."  Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (internal quotations omitted).  While more weight is generally given to the

opinion of an examining source than to the opinion of a non-examining source, state agency medical consultants are highly qualified physicians who are also experts in Social Security disability evaluation, and ALJs must consider their findings as opinion evidence. See 20 C.F.R. §§ 404.1527(d)(1); 404.1527(f)(2)(I). Additionally, in a case where no examining source has opined as to Plaintiff's abilities to perform work-related activities, it is within the ALJ's authority to rely on the RFC provided by a non-examining source. See Meares v. Barnhart, No. 102CV85CAS DDN, 2003 WL 22283913, at *11 (E.D. Mo. Aug. 29, 2003) (Magistrate's Rep. & Recommendation, adopted by Order dated Aug. 18, 2003) (citing 20 C.F.R. § 404.1527(f)(2)(I) and Melton v. Barnhart, No. Civ. 4-03-CV-10053, 2003 WL 21976088, at *4 (S.D. Iowa Aug. 4, 2003) (indicating that findings of fact and opinions made by non-examining agency physicians must be treated as "expert opinion evidence of non examining sources," and evaluated in conjunction with other medical evidence of record)).

The record indicates that, at the time the ALJ issued his decision, none of Plaintiff's treating physicians had opined as to Plaintiff's mental ability to do work-related activities. It was therefore within the ALJ's authority to rely on the mental RFC provided by Kyle DeVore, Ph.D., the state agency psychologist, and the ALJ's determination that Plaintiff had the RFC to perform work that did not require more than doing simple repetitive tasks or having more than occasional interaction with coworkers, supervisors, or the general public was consistent with Dr. DeVore's October 18, 2006 Psychiatric Review Technique and Mental RFC Assessment of Plaintiff. (Tr. 326-39.) Dr. DeVore indicated that Plaintiff had mild restrictions of activities of daily living; and

moderate difficulties in maintaining social functioning, concentration, persistence, or pace. (Tr. 334.) He also noted that there was insufficient evidence to determine whether Plaintiff's conditions resulted in repeated extended episodes of decompensation. (Tr. 334.) He therefore opined that Plaintiff needed to avoid intense or extensive interpersonal interaction, handling complaints of dissatisfied customers, close proximity to co-workers or controlled substances, and public contact. (Tr. 339.) He also indicated that Plaintiff could understand, remember, carry out, and persist at simple tasks; make simple work-related judgments; relate adequately to co-workers and supervisors; and adjust adequately to ordinary changes in work routine and setting. (Tr. 339.)

Additionally, the record indicates that, despite Plaintiff's allegations of severely limited daily activities, she reported taking a number of trips. (Tr. 478, 535, 752.) Plaintiff also worked as a truck driver for years, despite suffering from depression "[a]ll of [her] life." (Tr. 269, 297.) Nor did the ALJ observe any symptoms of depression in the Plaintiff's demeanor at the hearing. (Tr. 60.)

The Court is concerned that the ALJ stated that "[t]here is no documented evidence of the frequent crying spells . . . she alleged at the time of the hearing," see Tr. 59-60, when the record indicates that Plaintiff reported crying spells to her medical providers, see Tr. 297, 571-72, but the Court finds that there is sufficient evidence on the record as a whole, including medical evidence, to support the ALJ's determination that Plaintiff had the RFC to perform work that did not require more than doing simple repetitive tasks or having more than occasional interaction with coworkers, supervisors, or the general public. The Court, therefore, finds that the ALJ's determination of

Plaintiff's mental RFC was proper.

## New Evidence Submitted to Appeals Council

Plaintiff argues that the Appeal Council failed to properly evaluate the March 30, 2009 medical assessment of Plaintiff's mental ability to do work-related activities, completed by Dr. Feinberg, a treating psychiatrist. After her hearing, Plaintiff submitted additional records to the Appeals Council that were prepared after the ALJ denied her claim. These included Dr. Feinberg's March 30, 2009 medical assessment of Plaintiff's mental ability to do work-related activities, which found that Plaintiff had "no" ability to relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stress, or function independently, and had only a "fair" level of ability to follow work rules and maintain attention and concentration. (Tr. 775.) The Appeals Council concluded that the new records described Plaintiff's condition "at a later time" and therefore did "not affect the decision about whether you were disabled beginning, on or before February 20, 2008." (Tr. 2.) It also notified Plaintiff that while the records would not be considered, she could file a new claim to determine if she was disabled after February 20, 2008. (Tr. 2.)

The Commissioner's regulations provide that the Appeals Council must consider "new and material evidence" that "relates to the period on or before the date of the [ALJ] hearing decision." 20 C.F.R. § 404.970(b). Additional evidence submitted to the Appeals Council is material when it is "relevant to the claimant's condition for the time period for which benefits were denied." Lamp v. Astrue, 531 F.3d 629, 632 (8th Cir. 2008) (quoting Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000)).

The Eighth Circuit interprets a statement by the Appeals Council that additional evidence "did not provide a basis for changing the ALJ's decision" as a finding that the evidence in question was not material. Aulston v. Astrue, 277 F. App'x 663, 664 (8th Cir. 2008) (citing Bergmann v. Apfel, 207 F.3d 1065, 1069-70 (8th Cir. 2000) (noting that whether additional evidence meets criteria of materiality is a question of law that courts review de novo)).

After careful review, the Court concludes that Dr. Feinberg's assessment does not relate to the period on or before February 20, 2008. Dr. Feinberg's assessment was completed over a year after the ALJ's decision, and Dr. Feinberg did not begin treating Plaintiff until at least a month after the ALJ's decision. (Tr. 651.) See e.g. Roberson v. Astrue, 481 F.3d 1020, 1026 (8th Cir. 2007) (finding no error in Appeals Council's decision that new records prepared seven months after ALJ's decision described claimant's condition on date records were prepared, not on earlier date, and consequently were not material).

Dr. Feinberg's assessment is also distinguishable from the report at issue in Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990), cited by Plaintiff. In Williams, the treating physician's report was rendered after the issuance of the ALJ's decision, but contained a statement that "[t]his patient has suffered from chronic mental illness since her early adult hood [sic]." Id. The court found that this provided a sufficient basis to conclude that the report related to the period on or before the date of the ALJ's decision and was therefore material. Id. Conversely, Dr. Feinberg's narrative statements regarding Plaintiff's ability to make occupational adjustments are all written in the

present tense and do not refer back to dates prior to March 2009, over a year after the ALJ's decision. (Tr. 775.) Accordingly, the Court finds that the Appeals Council did not err in concluding that the new records referred to Plaintiff's condition after February 20, 2008, when the ALJ issued his decision, Roberson, 481 F.3d at 1026, and Dr. Feinberg's assessment does not provide a basis for reversing the ALJ's decision.

If the limitations set out in Dr. Feinberg's medical assessment on March 30, 2009, indeed persist, Plaintiff's recourse is to file a new application for benefits, alleging an onset of disability after the date of the ALJ's decision in this case.

## CONCLUSION

While there is evidence to support a contrary result, the ALJ's determination is supported by substantial evidence on the record as a whole. "It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo." Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. Jan. 2009) (citation omitted). "'If after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioners's findings, [the court] must affirm the denial of benefits.'" Id. (quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996)). Accordingly, the Court believes that the ALJ's decision should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED.**

30

A separate Judgment shall accompany this Memorandum and Order.


_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 31st day of March, 2011.